**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>TEREALL DESHAWN GREEN,<br>and JAVONTA JUAN HERBERT,<br><br>Defendants. | No. 18-CR-2006-LRR<br><br>**REPORT AND RECOMMENDATION<br>TO DENY DEFENDANTS' MOTIONS<br>TO SUPPRESS** |

_____

TABLE OF CONTENTS

I. Introduction……………………………………………………………………………2

II. Findings of Fact………………………………………………………………………3

III. Analysis ………………………………………………………………………………5

   A. Traffic Stop ………………………………………………………………………6

   B. Pat-Down Searches of Defendant Green ………………………………………8

      1. First Pat-Down Search of Defendant Green……………………………………9

      2. Second Pat-Down Search of Defendant Green ………………………………10

   C. Detention of Defendant Green …………………………………………………11

   D. Officer Girsch's Questions to Defendant Green ………………………………12

   E. Defendant Green's Flight After Arrest …………………………………………13

IV. Conclusion ……………………………………………………………………………13

## I. INTRODUCTION

This matter is before me pursuant to Tereall Deshawn Green's (Defendant Green) and Javonta Juan Herbert's (Defendant Herbert) motions to suppress evidence. (Doc. 26, Doc. 29). The grand jury charged defendants in a two-count indictment. (Doc. 3). Count 1 charged Defendant Green with possession of a firearm by a felon in violation of Title 18, United States Code, Section 922(g)(1). (*Id.*). Count 2 charged Defendant Herbert with possession of a firearm by a felon in violation of Title 18, United States Code, Section 922(g)(1). (*Id.*). The charges arose from evidence found during a traffic stop on January 13, 2018, in Waterloo, Iowa. Defendant Green seeks to suppress evidence of weapons found in the vehicle or on his person and evidence of his flight after arrest, allegedly obtained in violation of the Fourth Amendment to the United States Constitution. (Doc. 26). Defendant Green also seeks to suppress evidence of incriminating statements made by him, allegedly obtained in violation of the Fifth Amendment to the United States Constitution. (*Id.*). Defendant Herbert seeks to suppress evidence of weapons found in the vehicle, allegedly seized in violation of the Fourth Amendment to the United States Constitution. (Doc. 29). Defendant Herbert also seeks to suppress evidence of incriminating statements made by him, allegedly obtained in violation of the Fifth Amendment to the United States Constitution.[1] (Doc. 29).

The Honorable Linda R. Reade, United States District Court Judge, referred these motions to me for a Report and Recommendation. On April 18, 2018, I held an evidentiary hearing on defendants' motions at which Waterloo Police Officers Jordan Ehlers and Randy Girsch testified. I admitted into evidence government's Exhibit 1

---

[1] Defendant Herbert seeks to suppress all incriminating statements he made, but does not specify what statements he believes to be incriminating nor provides any legal basis for their suppression. I find no basis for suppressing any of the statements made by Defendant Herbert.

(Waterloo Police Department Reports) and Exhibit 2 (two DVDs containing videos of Waterloo police camera footage).

For the reasons that follow, I respectfully recommend the Court **deny** defendants' motions to suppress.

## II. FINDINGS OF FACT

Around 1:00 a.m. on January 13, 2018, Waterloo Police Officer Jordan Ehlers (Officer Ehlers) was on patrol and saw a black Nissan Rogue SUV speeding.[2] Officer Ehlers ran the license plate number on the SUV, which came back to a 2004 Mercedes-Benz ML 500. Officer Ehlers further noticed that a license plate frame on the SUV obscured a portion of the letters on the license plate and the registration sticker.

Officer Ehlers initiated a traffic stop of the SUV. The SUV did not immediately stop, continuing for approximately a quarter block before it turned into the driveway of a residence on Woodmayr Drive in Waterloo. While following behind the SUV, Officer Ehlers saw multiple persons inside the vehicle moving around.

Officer Ehlers approached the SUV from the passenger side, and the front passenger opened his window. Officer Ehlers immediately smelled an odor of alcohol. He observed multiple bottles of liquor at the feet of the front passenger, and the floor board appeared to be soaked. Officer Ehlers asked the driver for her license and registration. The driver explained to Officer Ehlers that she had just purchased the SUV and the plates belonged to her Mercedes.

After obtaining the driver's ID, Officer Ehlers asked for the ID's of the other passengers. The front seat passenger did not have an ID, but identified himself as Tereall Green. Officer Ehlers then moved back to talk to the back-seat passengers, and the back-

---

[2] Officer Ehlers believed the SUV was speeding by observation, and not as measured by pacing or radar. Officer Ehlers testified that he was trained to estimate the speed of cars by observation at the police academy and successfully completed that training.

3

seat passenger rolled down his window. As he did, Officer Ehlers smelled the odor of marijuana. This back-seat passenger identified himself as Deshawn Marks (Marks). The back-seat passenger on the driver's side identified himself as "Spencer Green." Officer Ehlers believed "Spencer Green" was nervous—he avoided eye contact, pulled his hat over his face, and was shaking.

Officer Ehlers walked back to his patrol car to run the ID's. He then called for additional officers to respond to the scene, and Officer Randy Girsch (Officer Girsch) and Officer Kenneth Schaaf (Officer Schaaf) responded. After the other officers arrived, Officer Ehlers asked Defendant Green to step out of the SUV. Officer Ehlers did a quick pat-down search of Defendant Green, but did not find anything. Officer Ehlers then asked Marks to step out of the SUV. Officer Ehlers conducted a pat-down search of Marks and found clear plastic baggies containing marijuana residue.

Defendant Green and Marks stood outside the vehicle. It was a frigid cold night, and Officer Girsch noticed Defendant Green and Marks were shivering. Officer Girsch offered to let them sit in his patrol car to stay warm. Defendant Green and Marks eventually accepted Officer Girsch's offer as long as Officer Girsch would keep the door open. Officer Girsch opened the door to his patrol car and Marks got in followed by Defendant Green.

Back at the SUV, Officer Ehlers went to the driver's side of the vehicle and asked "Spencer Green" to step out of the car. From prior contact with him, Officer Ehlers recognized "Spencer Green" as Javonta Herbert, and "Spencer Green" confirmed that his real name was, in fact, Javonta Herbert. Officer Ehlers then conducted a pat-down search of Defendant Herbert.

As Officer Ehlers was conducting a pat-down search of Defendant Herbert, Officer Schaaf searched a small bag for weapons, and did not find any. Officer Schaaf, using his flashlight, looked into the back seat of the SUV and immediately saw a handgun on

4

the floorboard underneath the driver's seat. Officer Schaaf yelled "Ten Thirty-Two,"[3] notifying the other officers he had found a firearm. Officer Ehlers then placed Defendant Herbert under arrest.

Back at his patrol car, Officer Girsch heard Officer Schaaf yell that he had found a firearm. Officer Girsch decided to handcuff Defendant Green for officer safety. A fourth officer, Nicholas Weber (Officer Weber), arrived and handcuffed Marks.

After handcuffing Defendant Green, Officer Girsch conducted a second, more thorough pat-down search of Defendant Green. During this search, Officer Girsch found a firearm in Defendant Green's groin area. Officer Girsch attempted to remove the firearm from Defendant Green's pants, but it was tied to the drawstring of the pants. Officer Girsch asked Defendant Green if the firearm was loaded, and Defendant Green acknowledged it was. Officer Weber eventually cut the firearm free from Defendant Green's pants.

Officer Girsch placed Defendant Green in the back of another officer's patrol car. A short time later, Defendant Green escaped from the patrol car and ran away. Officers pursued Defendant Green, eventually finding and detaining him.

I found both of the officers to be credible witnesses. This is based in part on my observations and their demeanor during their testimony. Both officers admitted when they did not know things. Moreover, the testimony of both officers is supported by their respective body camera footage. (Exhibit 2).

### III. ANALYSIS

Defendants' motions raise a number of issues. The first issue is whether Officer Ehlers had probable cause to initiate a traffic stop. The second issue is whether the first and second pat-down search of Defendant Green were justified by reasonable suspicion.

---

[3] "Thirty-Two" is the Waterloo Police Department's code for a firearm.

The third issue is whether Defendant Green was illegally detained. The fourth issue is whether Officer Girsch's questions to Defendant Green constituted an improper custodial interrogation. The final issue is whether evidence of Defendant Green's flight after arrest must be excluded. I will address each of these issues in turn.

### A. *Traffic Stop*

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. It is well established that a traffic stop constitutes a seizure for Fourth Amendment purposes. *Whren v. United States*, 517 U.S. 806, 809-10 (1996). A traffic stop is lawful if supported by probable cause or reasonable suspicion that a vehicle committed a traffic violation. *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006). "While 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop." *United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004). The reasonable suspicion standard "is a fact-specific inquiry based on the totality of the circumstances in a particular case." *United States v. Riley*, 684 F.3d 758, 764 (8th Cir. 2012). "Even a minor traffic violation provides probable cause for a traffic stop." *United States v. Harris*, 617 F.3d 977, 979 (8th Cir. 2010). Objectively reasonable mistakes of law or fact may still justify a valid traffic stop. *Id.*

Both Defendant Green and Defendant Herbert argue that Officer Ehlers had no objectively reasonable suspicion to conduct a traffic stop on the SUV. (Doc. 27, at 10; Doc. 34, at 1). According to his report and his testimony, Officer Ehlers initiated the traffic stop of the SUV for three independent violations: (1) speeding; (2) a license plate frame obstructing the registration sticker, and; (3) a license plate inquiry showing the registration did not belong to the SUV. (Exhibit 1, at 1).

Officer Ehlers testified that he observed a black SUV traveling at a higher rate of speed than the posted speed limit in violation of Iowa Code Section 321.285. Officer Ehlers testified that his patrol car's speed radar equipment was turned off, so he was unable to establish exactly how fast the SUV was traveling. Officer Ehlers has received training to recognize how fast a vehicle is traveling, he observed the SUV accelerating at a high rate of speed after turning, and he followed behind the SUV trying to catch up. In addition, there is no evidence that Ehlers' estimate of the SUV's speed was a mere pretext for stopping the SUV. As previously noted, I found Officer Ehlers a credible witness. In short, I find the totality of the circumstances establish that Officer Ehlers had probable cause to believe that the SUV was speeding. *Cf. United States v. Gaffney*, No. CR13-2035, 2014 WL 69781, at *6 (N.D. Iowa Jan. 8, 2014) (unreported) (finding that under the totality of the circumstances, an officer's visual estimation of speed was sufficient to establish probable cause to stop a vehicle). Therefore, I find, given the totality of the circumstances, Officer Ehlers had probable cause to believe the SUV was in violation of Iowa Code Section 321.285.

Second, Officer Ehlers observed a license plate frame on the SUV "covering the letters on the plate and the registration sticker." (Exhibit 1, at 1). Iowa Code Section 321.37(3) reads, "It is unlawful for the owner of a vehicle to place any frame around or over the registration plate which does not permit full view of all numerals and letters printed on the registration plate." Officer Ehlers testified that he observed the license plate frame partially obstructing the license plate prior to initiating the traffic stop. Officer Ehlers testimony is supported by video from his body camera which shows the license plate frame partially covering the license plate. (Exhibit 2). Therefore, I find Officer Ehlers had probable cause to believe the SUV was in violation of Iowa Code Section 321.37.

Third, Officer Ehlers, prior to initiating the traffic stop, "ran an inquiry of the license plate which returned showing that the registration belonged on a silver 2004 Mercedes-Benz ML 500. The vehicle that the registration was on was a black 2011 Nissan Rogue." (Exhibit 1, at 1). Pursuant to Iowa Code Section 321.17, "[i]t is a simple misdemeanor . . . for any person to drive or move or for an owner knowingly to permit to be driven or moved upon the highway a vehicle of a type required to be registered under this chapter which is not registered, or for which the appropriate fees have not been paid." The SUV had plates registered to a different vehicle, which called into question whether the SUV was in violation of this code section. After Officer Ehlers initiated the traffic stop, the driver of the SUV "stated that the plates did not match the car because [the driver] just purchased the car and put her old plates on the new vehicle." (Exhibit 1, at 1). Officer Ehlers was unaware of this information at the time he initiated the traffic stop. Therefore, I find Officer Ehlers had probable cause to believe the SUV was in violation of Iowa Code Section 321.17.

I find Officer Ehlers had probable cause to believe the SUV was in violation of three different Iowa traffic laws. Therefore, I find the traffic stop was valid under the Fourth Amendment.

### B. *Pat-Down Searches of Defendant Green*

"Officers may conduct a protective pat-down search for weapons during a valid stop . . . when they have objectively reasonable suspicion that a person with whom they are dealing 'might be armed and presently dangerous and criminal activity might be afoot.'" *United States v. Robinson*, 664 F.3d 701, 704 (8th Cir. 2011) (quoting *United States v. Davis*, 202 F.3d 1060, 1063 (8th Cir. 2000). A court must determine whether reasonable suspicion exists based on "the totality of the circumstances, in light of the officer's experience." *United States v. Stigler*, 574 F.3d 1008, 1010 (8th Cir. 2009) (quotation omitted). What constitutes reasonable suspicion is not "readily, or even

usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995). When evaluating whether reasonable suspicion exists, courts must "view the [officers'] observations as a whole, rather than as discrete and disconnected occurrences." *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987); *see also United States v. Arvizu*, 534 U.S. 266, 274 (2002) (rejecting court of appeal's reasonable suspicion analysis where the "court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the 'totality of the circumstances'").

### *1. First Pat-Down Search of Defendant Green*

Defendant Green argues the officers lacked the reasonable suspicion needed to conduct a pat-down search for weapons. (Doc. 27, at 10-12).

Before conducting the first pat-down search, Officer Ehlers told Officer Schaaf when Schaaf arrived at the scene, "smells like weed, alcohol, front seat passenger recent intel for a Thirty-Two" and "rear passenger on driver's side is pretty dang nervous." (Exhibit 2). Other factors taken into account include the license plates on the SUV not matching the vehicle registered to those plates, the SUV's failure to stop immediately, the suspicious movements of the occupants in the car, the inherent dangerousness of a traffic stop, the time of night, Defendant Herbert's nervousness upon encountering law enforcement officers, and the presence of people coming out of the house.

Defendant Green alleges "Ehlers knew there was not a smell of marijuana coming from the vehicle. None of the other officers mentioned it, and none was found in the SUV." (Doc. 27, at 11). This is inaccurate. Officer Ehlers searched Marks and "located clear plastic bags containing marijuana residue in them in his pocket." (Exhibit 1, at 1).

9

Officer Schaaf, while speaking with the driver, stated he "could smell an odor consistent with that of an alcoholic beverage, and also marijuana coming from the vehicle." (Exhibit 1, at 6). In addition, Officer Ehlers testified that Marks admitted to Officer Weber that Marks had been smoking marijuana. Although the parties did not offer Officer Weber's body camera as part of the evidence, Officer Ehlers' testimony is supported by Officer Schaaf's body camera which partially picks up a conversation between Marks and Officer Weber discussing marijuana. (Exhibit 2).

I find, given the totality of the circumstances, the officers had objective reasonable suspicion to believe the occupants of the car "'might be armed and presently dangerous and that criminal activity might be afoot.'" *Robinson*, at 704 (quoting *Davis*, at 1063). Therefore, the first pat-down search of Defendant Green was justified for officer safety. I note that, in any event, the officers did not find any incriminating evidence as part of that pat down. Officer Ehlers testified that while patting down Defendant Green he felt something hard at the location where Defendant Green's belt buckle should have been located, asked if it was a belt buckle, and Defendant Green replied affirmatively. Officer Ehlers therefore passed over what turned out to be a handgun secreted at that location.

## *2. Second Pat-Down Search of Defendant Green*

Defendant Green next argues the second pat-down search that Officer Girsch conducted was illegal. (Doc. 27, at 12-13).

Officer Girsch testified that he heard Officer Schaaf yell, "Ten Thirty-Two," which indicated that Officer Schaaf had found a firearm. Officer Girsch "did not know where the gun was located" and "kept things with Green and Mark cool . . . waiting for more cars to arrive." (Exhibit 1, at 4). Once Officer Weber arrived, Officer Girsch handcuffed Green for officer safety, and "did a better pat search of [Defendant Green] due to a gun being found." (*Id.*). Almost immediately, Officer Girsch found the firearm located in Defendant Green's groin area.

Defendant Green alleges "[t]he fact that a gun was found several car lengths away from Green did not make it more likely that Green was in current possession of a weapon or was more dangerous than he had been just a moment before." (*Id.*, at 12). Officer Girsch testified that Officer Ehlers earlier pat-down search of Defendant Green was "quick." Officer Ehlers was wearing gloves during the first pat-down search, and conducted a "quick" pat-down search due to the extremely cold temperature. After being notified that a gun had been found, Officer Girsch conducted a "better pat search" for officer safety. Officer Girsch was aware of an additional circumstance that heightened the dangerousness of the situation.

Given the totality of the circumstances, including all of the evidence that justified the first pat-down search, I find Officer Girsch was justified in handcuffing Defendant Green and conducting a more thorough pat-down search of Defendant Green's person after other officers had found a firearm.

### C. *Detention of Defendant Green*

Defendant Green next argues he was "illegally detained" by the officers. (Doc. 27, at 12). Defendant Green alleges: "Officer Girsch escorted [Defendant Green and Marks] back to the last patrol vehicle in the street, several car lengths away from the SUV. This was no mere chance choice of vehicles. Girsch stood in the doorway, completely blocking Green's exit, even though Green and Marks were not yet handcuffed." (*Id.*).

Again, Defendant Green's description of the facts is inaccurate. By all accounts, the temperature was frigid cold on the night of the incident. Officer Girsch noticed Defendant Green and Marks were both "cold and shivering," so Officer Girsch "told them they were welcome to come back to [Officer Girsch's] car and have a seat to stay warm." (Exhibit 2). Defendant Green hesitated at first, but then accepted Officer Girsch's offer when Officer Girsch said that Officer Girsch would keep the door open.

Defendant Green voluntarily went to Officer Girsch's car in order to keep warm.  Officer Girsch kept his promise and left the car door open.

I find that Defendant Green was not illegally detained.  Officer Girsch did not force Defendant Green into the car or block Defendant Green from getting out of the car. Regardless, for analysis purposes, it makes no difference whether Defendant Green was standing in the cold next to Officer Girsch or sitting in the patrol car with Officer Girsch standing in front of him.  Defendant Green was *legally* detained while the traffic stop was ongoing as the officers had reasonable suspicion to believe Defendant Green "'might be armed and presently dangerous and that criminal activity might be afoot.'"  *Robinson*, at 704 (quoting *Davis*, at 1063).

### D. *Officer Girsch's Questions to Defendant Green*

Defendant Green also argues Officer Girsch's questions to Defendant Green while the two were near Officer Girsch's patrol car "constituted custodial interrogation, and Green had not yet been advised of his rights."  (Doc. 27, at 12).

Prior to placing Defendant Green in handcuffs, Officer Girsch asked Defendant Green whether he had anything on him.  (Exhibit 2).  In response, Defendant Green's statements mostly consisted of Defendant Green saying he did not have anything on him and that he did not know what might be in the SUV.  (*Id.*).  At this point, Defendant Green was not in custody for the purposes of *Miranda*, and, thus, Officer Girsch was under no obligation to advise Defendant Green of his *Miranda* rights.  *Berkemer v. McCarty*, 468 U.S. 420, 439-440 (1984).

Once Officer Girsch was alerted to the discovery of a firearm in the SUV and he handcuffed Defendant Green, Officer Girsch's questions related to safety concerns. As he began his pat-down search of Defendant Green, Officer Girsch asked Defendant Green whether he possessed a gun. Once Officer Girsch felt the handgun secreted on Defendant Green's person and determined it was a firearm, Office Girsch asked Defendant Green whether the gun was loaded, and Defendant Green admitted that the gun was loaded. Because these questions were designed to protect officer and public safety, they fall into the public safety exception to *Miranda*. *New York v. Quarles*, 467 U.S. 649, 655-57 (1984).

I find Defendant Green was not subject to unlawful custodial interrogation, and, therefore, there is no basis to suppress the statements.

### E. *Defendant Green's Flight After Arrest*

Last, Defendant Green argues "[e]vidence of Green's flight must be excluded" because "[h]ad he not been subjected to an illegal first or second pat-down search, he would not have been detained in a police car." (Doc. 27, at 13).

Having found the first and second pat-down searches to be legal under the Fourth Amendment, I find no basis to suppress evidence of Defendant Green's flight after arrest.

### IV. CONCLUSION

For the reasons set forth above, I respectfully recommend the Court **deny** Defendant Green's and Defendant Herbert's Motions to Suppress. (Doc. 26, Doc. 29).

Objections to this Report and Recommendation in accordance with 28 U.S.C. § 636(b)(1) and FED. R. CRIM. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* FED. R. CRIM. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the

district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**IT IS SO ORDERED** this 25th day of April, 2018.

_____
C.J. Williams
Chief United States Magistrate Judge
Northern District of Iowa